**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| **In re**<br><br>**JORGE F. QUINTAO,**<br><br>                          **Debtor**<br>_____<br><br>**JORGE F. QUINTAO,**<br><br>                          **Plaintiff**<br><br>**v.**<br><br>**DEUTSCHE BANK NATIONAL TRUST CO.,**<br>**HOMEWARD RESIDENTIAL, INC., and**<br>**OCWEN LOAN SERVICING, LLC,**<br><br>                          **Defendants** | **Chapter 13**<br>**Case No. 09-18838-FJB**<br><br><br><br><br>**Adversary Proceeding**<br>**No. 15-1063** |

**MEMORANDUM OF DECISION ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

By his amended complaint in this adversary proceeding, the plaintiff and chapter 13 debtor,

Jorge Quintao ("Quintao"), seeks damages against defendants Deutsche Bank National Trust Co.,

Homeward Residential, Inc., and Ocwen Loan Servicing, LLC (the "Defendants") for alleged violations of

the automatic stay (two counts) and of his confirmed plan (one count).  The adversary proceeding is

before the Court on a motion of the Defendants for summary judgment.  For the reasons set forth

below, the Court will grant the motion as to all counts.

**I.        Procedural History**

The Amended Complaint is organized into just two counts, the first for relief under 11 U.S.C. §

362(k)(1) for violation of the automatic stay and the second for violation of Debtor's confirmed chapter

13 plan; however, the first count demands relief for two separate violations of the stay and therefore is

in fact two counts—hence three counts in all.  By my renumbering they are as follows.  In Count I,

Quintao alleges that the Defendants violated the automatic stay—specifically, they attempted to collect

a prepetition debt, a violation of § 362(a)(6)—when it billed him for and collected amounts it had paid

for overdue real estate taxes on the mortgaged property.  In Count II, Quintao alleges that the

Defendants violated the automatic stay by reporting to the credit reporting agencies that he had made

late payments on his account from 2012 to 2014 and that the condition of his account in this period was

"derogatory"; this, too, the Amended Complaint alleges constituted an attempt to collect a prepetition

debt.   And in Count III, Quintao alleges that the Defendants violated the terms of his confirmed chapter

13 plan when they acted to collect the pre-petition real estate taxes that they had paid, which taxes the

plan provided would be paid by the Debtor through the chapter 13 trustee to the town to which they

were owed. Each of these counts is asserted against three defendants:  Deutsche Bank National Trust

Co. ("Deutsche Bank"), which at all relevant times has served as trustee of the trust that holds the

mortgage and related promissory note (Deutsche Bank as trustee, "the Mortgagee"); Homeward

Residential, Inc. ("Homeward"), which serviced the loan for the Mortgagee during some of the relevant

period; and Ocwen Loan Servicing, LLC ("Ocwen"), which also serviced the loan for the Mortgagee

during some of the relevant period. For the alleged violations of the automatic stay, Quintao demands

actual and punitive damages and attorney's fees.

        The adversary proceeding is before the Court on the Defendants' motion for summary

judgment.  As to Count III, for alleged violation of the chapter 13 plan and/or its confirmation order, the

Defendants argue that they are entitled to judgment as a matter of law because, on the uncontroverted

evidence, the plan simply did not prohibit the Defendants from paying the Debtor's prepetition real

estate tax arrearage.  The remaining arguments for summary judgment go to the counts for violation of

the automatic stay.  The Defendants argue that they are entitled to judgment as a matter of law on

Counts I and II because:  (i) as to Count I, the billing of the Debtor for the escrow shortages resulting

from Defendants' payment of the prepetition taxes was not a violation of the stay; (ii) also as to Count I

and especially in view of this Court's local rule MLBR 4001-3(a), a mortgagee's sending of monthly

mortgage statements to a debtor, unaccompanied by coercion or harassment, is not a violation of the

stay; (iii) as to Count II, the truthful reporting to a credit reporting agency of a credit delinquency,

without coercion or harassment, is not a violation of the stay; (iv) as to Counts I and II, the debtor must

show actual damages but has no evidence that he suffered actual damages of any kind and emotional

distress damages in particular; (v) as to Counts I and II, the uncontroverted facts do not justify punitive

damages; and (vi) as to Counts I and II, the doctrine of laches bars any recovery because the

uncontroverted evidence indicates that Quintao waited four years after learning of this alleged violation

to first complain of it.  In response, Quintao disputes the validity of each of these arguments.  Along the

way, he also asserts that the evidence permits a finder of fact to rule in his favor on one additional count

that he did not mention in the complaint (alleging that it was a further violation of the stay for the

Defendants to note in their internal records his prepetition arrearage on real estate taxes) and on a

modified version of another (that Defendants' report to the credit reporting agencies was a violation of

the stay *because it was false* in that it overstated the amount of his monthly mortgage payment).

II.     **Undisputed Facts**

In support of their motion for summary judgment, the Defendants filed a statement of the

material facts of record as to which they contend there is no genuine issue to be tried, with citations to

support for each fact in affidavits and other documentation, all as required by D. Mass. LR 56.1, made

applicable by MLRB 7056-1.  Also pursuant to the same rules, Quintao filed a response to the

Defendants' statement in which he admitted most of the facts on which the Defendants rely and

identified those few he disputes and the evidence that he contends creates a genuine issue of fact as to

them.  Quintao augmented several of his responses to the Defendants' Statement of Undisputed facts

with "contentions" regarding their relevance and significance.  While the non-moving party is expected

3

to state whether any such facts are "controverted," argument about the significance of the facts is not

envisioned by Rule 56.1.  Quintao's "contentions" are arguments and will be treated as such.  Quintao

also filed a statement of additional facts that he believes create genuine issues for trial.  The Defendants

did not file a reply to Quintao's statement of additional facts, as was their right under the local rule.

The following are the facts relevant to the determination of this motion.  With few exceptions,

all noted, they are uncontroverted.

Quintao resides on real property in Framingham, Massachusetts (the "Property") that he

purchased in July 2005 for $389,000.  To complete the purchase, he borrowed $311,200.00 from Argent

Mortgage Company, LLC ("Argent") and, on July 6, 2005, signed a Note and Mortgage in which he agreed

that his initial monthly payments would be $1,816.08 principal and interest, with a maturity date of

August 1, 2035. From the date of the Note until 2009, he had difficulty making payments.

The mortgage provides that Quintao "shall pay to Lender . . . amounts due for . . . taxes . . .

which can attain priority over this Security Instrument as a lien or encumbrance on the Property."  And

the Mortgage further provides that "if there is a shortage of funds held in escrow . . . Lender shall notify

Borrower [Quintao] as required by RESPA, and Borrower shall pay Lender the amount necessary to make

up the shortage in accordance with RESPA, but in no more than twelve monthly payments."  At the time

of his bankruptcy filing, however, Quintao was responsible for paying his real estate taxes and water and

sewer payments directly to the Town, and his mortgage payments consisted only of principal and

interest.

On January 15, 2009, Argent assigned the Mortgage to Deutsche Bank National Trust Company,

as Trustee for Argent Securities Inc. Asset-Backed Pass-Through Certificates, Series 2005-W2 (the

"Trust").

On September 17, 2009, Quintao filed a petition for relief under Chapter 13 of the Bankruptcy

Code, and with the petition he filed a chapter 13 plan (the "Plan").  The only secured creditor to be paid

through the Plan was the Town of Framingham (the "Town"); under the Plan, the Town was to receive

$24,774.13 on account of secured claims for prepetition real estate taxes and prepetition water and

sewer charges.  The Plan did not purport to modify Quintao's obligations on his mortgage debt, which by

this point was held by Deutsche Bank as trustee; instead, it simply provided that Quintao would pay this

claim to the creditor directly, not through the plan.[1]  In the cryptic language of chapter 13 plans, this

meant that Quintao was electing and committing to maintain payments on this claim while the case was

pending, as permitted by 11 U.S.C. § 1322(b)(5).  The Plan contained no other provisions pertaining to

the mortgage claim held by Deutsche Bank as trustee.  It contained no injunction at all.

On October 5, 2009, the Town filed a Proof of Claim ("Town's POC") for $18,722.68 for taxes and

utilities.  A Town official testified that at no point did Quintao or any of his representatives ever contact

the Town regarding tax payments.

On November 6, 2009, the Trust, through its authorized agent and loan servicer, AHMSI, filed a

Proof of Claim (the "Trust's POC") for a secured claim of $293,303.01.  The Trust's POC states that

Quintao's current monthly payment amount is $1,816.08 but that it "may change due to escrow

requirements."  The Trust's POC, claim number 5, indicated that no arrears were due as of the petition

date.

On March 23, 2010, the Bankruptcy Court entered an order confirming the Plan (the

"Confirmation Order"). In relevant part, the Confirmation Order provided that (i) Quintao was to make

sixty monthly payments of $472.98 to the chapter 13 trustee; (ii) from the funds she received, the

trustee would disburse to the Town (a) on account of its secured claim for real estate taxes, sixty

monthly of payments of $360.50, for a total of $21,629.98 for real estate taxes, and (b) on account of its

---

[1] In the plan the creditor is identified as "AHMSI Servicing Inc."  This was a reference to the entity known as American Home Mortgage Servicing, Inc. ("AHMSI").  At the time, AHMSI was the authorized agent of, and servicer of the mortgage loan for, Deutsche Bank as Trustee.  AHMSI later became known as Homeward Residential, Inc., under which name it is a defendant in this adversary proceeding.

secured claim for water and sewer charges, sixty monthly payments of $52.40, for a total of $3,144.15

for water and sewer charges;[2] and (iii) with respect to the claim asserted by AHSMI on behalf of the

Mortgagee,  the latter was retaining its mortgage, and "[t]he Debtor shall continue to make regular

monthly payments in accordance with the contract," meaning the Note and Mortgage that Quintao had

originally given to Argent and that was now held by Deutsche Bank as trustee.  By this language, it was

understood that Quintao would continue to make the contractually required payments to Deutsche

Bank as trustee, through its servicer AHMSI, and that these payments were not to be made by the

chapter 13 trustee from moneys paid to her by the debtor but by Quintao directly to AHMSI.

In April 2010, the Chapter 13 Trustee (the "Trustee") started making payments to the Town.

Every single payment from the Trustee to the Town was identified by the Trustee as "WATER & SEWER"

and, except for the first and last payments, was for $312.04.  By the end of the Plan, the Trustee had

paid the Town $18,722.68, of which the Town applied $312.04 to pre-petition real estate taxes,

$16,387.43 to water and sewer payments, and $2,023.21 to post-petition real estate taxes.

On August 23, 2010, the Trust moved for relief from the automatic stay ("Trust's Relief from

Stay Motion") on the stated basis that Quintao had "post-petition delinquency" under the Note as well

as "encumbrances on the Real Property," including pre-petition and post-petition overdue real estate

taxes.  Quintao did not oppose the Trust's Relief from Stay Motion.  On September 10, 2010, the

Bankruptcy Court granted the motion, stating in relevant part: "Movant is hereby granted relief from the

automatic stay to exercise its rights as to [the Property]."  The order was stayed by operation of Fed. R.

Bankr. P. 4001(a)(3) for fourteen days and therefore became effective on September 24, 2010.

On July 28, 2010, before the filing of the Trust's Relief from Stay Motion, AHMSI recorded a

notation in its internal records to the effect that the Property was an imminent loss due to prepetition

---

[2] The record contains no indication as to why, when the Town filed a claim for a lesser amount than Quintao had
made provision in his Plan, Quintao did not amend or modify his plan to provide for payment of only the lesser
amount.

taxes owed to the Town.  On diverse dates around the same time but all before the filing of the Trust's

Relief from Stay Motion, AHMSI recorded other notations in its internal records of the existence of the

arrearage to the Town for obligations that would prime the Mortgage.

After the order granting relief from the stay became effective, AHMSI began its foreclosure

activities. Part of the foreclosure process was to pay off existing priority encumbrances on the Property.

As of October 8, 2010, Quintao was delinquent on post-petition Loan payments and on 2007, 2008,

2009, and 2010 real estate taxes on the Property (the "Overdue Taxes").  On October 8, 2010, the

Trust's loan servicer, AHMSI, sent a check for $17,891.53 ("October 2010 AHMSI Check") to the Town.

The Town deposited the check and applied it to pay off the Overdue Taxes.  On October 18, 2010, while

the stay was no longer in place, AHMSI sent Quintao a notice of default.  In February 2011, again while

the stay was lifted, Quintao received an escrow analysis from AHMSI, which included real estate taxes.

According to Quintao, in September 2011, also while the stay was lifted, AHMSI notified Quintao that he

was in breach of the terms of his Note and Mortgage.

On December 7, 2011, Quintao filed a motion to reimpose the automatic stay on Deutsche Bank

as trustee (the "Motion to Reimpose").  In the motion, Quintao alleged that he was timely making his

mortgage payments each month, and that Deutsche Bank, through AHMSI, had "been misapplying

payments towards Debtor's pre-bankruptcy arrearage, which is being paid through the Chapter 13

plan."  On January 30, 2012, in an affidavit he filed in support of the Motion to Re-impose the stay,

Quintao stated AHMSI "continues to charge my account for the real estate taxes which are part of my

plan."  On May 1, 2012, Quintao and his attorneys submitted to AHMSI a letter stating that Quintao is

"unable to continue making payments under the current mortgage agreement to AHMSI."

While the stay was lifted, Quintao paid AHMSI, rather than the Town, the Overdue Taxes.

Deutsche Bank as trustee initially opposed the Motion to Reimpose but, on July 23, 2012,

withdrew its opposition.  Upon this withdrawal, the Court, on July 24, 2012, granted the Motion to

Reimpose, essentially thereby reinstating so much of the automatic stay as had been lifted by the

Court's earlier grant of relief from the stay. In sum, the period in which the Defendants enjoyed relief

from the stay ran from September 24, 2010 until July 24, 2012.

After the stay was reimposed, Quintao alleges, he continued to receive monthly statements.

On February 28, 2013, Homeward filed a Notice of Mortgage Payment Change with the

Bankruptcy Court, showing a change in the monthly payment to $4,706.45, due to an escrow payment

account adjustment from $357.28 to $2,890.37.

On March 11, 2013, Deutsche Bank as trustee transferred the servicing of its loan from

AHMSI/Homeward to Ocwen Loan Servicing, LLC ("Ocwen"); from that date forward, Ocwen handled the

servicing of the loan.  In September 2013, the Trust filed a Transfer of Claim Notice, reflecting the

transfer of servicing to Ocwen.

The sixty-month term of the confirmed Plan expired in 2014.  In 2015, the chapter 13 trustee

filed her final report and account; in it she reported that she had disbursed $18,722.68 to the Town and

nothing to AHMSI or any subsequent loan servicer for Deutsche Bank as trustee.

On April 3, 2015, Quintao filed the complaint commencing this adversary proceeding.  He filed

his amended complaint on July 8, 2015.

As noted, in one instance, Quintao denied an assertion of the Defendants.  The Defendants

allege that it is uncontroverted that "since Ocwen has been servicing the Loan, Quintao has not been

paying his post-petition taxes," but Quintao denies that fact, and the fact is controverted.[3]  (Defendants'

Statement of Undisputed Material Facts, ¶ 28).  Importantly, however, Quintao does admit that when

the motion for relief from stay was filed, he was in arrears for his post-petition mortgage payments and

his real estate taxes for 2007, 2008, 2009, and 2010. (Defendants' Statement of Undisputed Material

Facts, ¶ 18).

---

[3] I express no opinion here as to whether the controverted fact is material.

In addition, Quintao has adduced evidence of additional facts that he contends create issues of material fact.  The evidence includes three affidavits; his own, one from his bankruptcy attorney, and one from a paralegal in his attorney's office (now herself an attorney).  The adduced evidence also includes numerous documents, attached as exhibits to the "Plaintiff's Statement of Facts" [doc. #55], that he filed in support of his opposition to the Motion for Summary Judgment.  Most of the additional evidence goes to the issues of injury, damages, and laches.  I need not reach these issues and therefore refrain from rehearsing the facts this evidence would permit a court to find as to them.  The remainder are either reflected in the facts recited above (especially that, after the Mortgagee paid the prepetition arrearage, it sent him monthly statements and an escrow analysis that indicated his obligation to repay the same to the Mortgagee through substantially higher monthly payments than he had previously been obligated to pay, much to his confusion and distress) or, in view of the uncontroverted fact that I regard to be dispositive, immaterial.

III.    **The Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine issue of material fact and, on the uncontroverted facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56, made applicable by Fed. R. Bankr. P. 7056; *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 763 (1st Cir. 1994).  Where the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of its cause of action.  The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under Fed. R. Civ. P. 50(a).  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Provided it does so, the burden then shifts to the opposing party to adduce evidence that establishes a genuine issue of material fact as to at least one essential element of the moving party's case.  The Court must view all evidence in the light most favorable to the nonmoving party and indulge all inferences favorable to that party. *Daury v.*

9

*Smith*, 842 F.2d 9, 11 (1st Cir. 1988).  The ultimate burden of proving the absence of a genuine issue of

material fact remains at all times on the moving party.  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Martinez-Rodriguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010), quoting from *Anderson v. Liberty

Lobby, Inc.*, *supra*.  With respect to issues upon which there are cross-motions for summary judgment,

each cross-motion must be decided on its own merits, though the court need not consider each in a

vacuum.  *See Puerto Rico American Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 133 (1st Cir. 2010).

Where the moving party would not bear the burden of proof at trial, the movant's initial burden

is simply to demonstrate or point out a lack of evidence to support at least one essential element of the

opposing party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  The burden then shifts to

the opposing party to adduce such evidence on each of the disputed elements as at trial would be

sufficient to withstand a motion for directed verdict.  *Anderson v Liberty Lobby, Inc., supra*.

IV.     **Analysis**

**(a) Alleged Violation of Chapter 13 Plan**

I begin with the only count of the Amended Complaint that is not for violation of the automatic

stay.  In Count III, Quintao argues that Deutsche Bank's payment of the prepetition arrearage was a

violation of the confirmed Plan itself because the Plan made provision for payment of that arrearage by

other means.  In support of this count, Quintao cites no injunction in the Plan that prohibited Deutsche

Bank from paying this arrearage.  Rather, in Quintao's view, the inconsistency between the Plan's

method of payment and Deutsche Bank's payment of the debt means that the latter "violated" the Plan

and warrants sanctions.

The facts relevant to the disposition of this count are not in controversy.  The only issue is

whether they state a claim on which relief can be granted.  I conclude that they do not.

This count is in the nature of one for civil contempt.  Reduced to its essentials, the underlying

argument for relief is this: that the Plan having been confirmed, Deutsche Bank and its agents were

obligated by the Confirmation Order to obey it, and their knowing violation of that order constituted a

contempt.[4]  To establish a right to relief for civil contempt, a party must show that (i) the alleged

contemnor committed an act that violated the order in question (ii) with general intent to commit the

act and (iii) with knowledge of the order in question. *In re Schlichtmann*, 375 B.R. 41, 95 (Bankr. D. Mass.

2007).  Due process further requires that the order in question, or the relevant provisions of law that

define its scope, be clear and unambiguous as to whether the conduct in question is prohibited. *Id*.

This count fails because neither the Confirmation Order nor the plan it confirmed included an

injunction against the mortgagee's exercise of its underlying rights in general or of its right to pay senior

encumbrances on the mortgaged property in particular.[5]  To the contrary, the Plan did not in any

respect purport to modify rights of the Mortgagee.  Quintao relies heavily on the language in 11 U.S.C. §

1327(a) that "[t]he provisions of a confirmed plan bind the debtor *and each creditor*."  But this language

is beside the point.  The more immediate question is, *to what* did the Plan bind this creditor?  Neither

the Plan nor the Confirmation Order contains an express injunction against the Mortgagee, and Quintao

does not argue otherwise.

Rather, he suggests that the Plan, as confirmed, *implicitly* enjoined the Mortgagee from paying a

debt that the Plan itself made provision to pay by other means.  I know of no authority for this

proposition, certainly nothing of such prominence as would have put the Mortgagee on notice of the

injunction.  Moreover, an injunction of this sort would constitute a modification of the rights of this

---

[4] The Bankruptcy Code includes a provision for redress of violations of the automatic stay, see 11 U.S.C. § 362(k), but no similar provision for redress of violations of a confirmed plan.  Accordingly, as with violations of the discharge, the Court looks to the generally applicable law of contempt.
[5] Chapter 13 plans seldom contain injunctions against creditors, because chapter 13 debtors generally enjoy the benefit of the automatic stay during the pendency of their plans; in most instances, the automatic stay provides all the protection the debtor needs.

mortgagee, and such modifications, when they occur, must be explicit enough to put the mortgagee on notice that, through the plan, the debtor is seeking to modify the mortgagee's rights in some respect. The rights of a holder of a secured claim that is secured only by a security interest in real property that is the debtor's principal residence may not be modified in a chapter 13 plan.  11 U.S.C. § 1322(b)(2). A plan that does not put a secured creditor holding a mortgage on the debtor's residence that it is seeking to modify the holder's rights should not be construed as modifying those rights.  In any event, in the Confirmation Order, the treatment of this claim appears in a section entitled "Unmodified Secured Claims"; the Court itself thus viewed the rights of this mortgagee as unmodified.[6]  I conclude that the Plan did not contain the implicit injunction for which Quintao argues.  And I further conclude that any such modification could not have been sufficiently clear and unambiguous as to whether the conduct in question was prohibited to support a holding of contempt against the Defendants.

For these reasons, the Defendants are entitled to judgment as a matter of law on the Count for violation of the Plan and Confirmation Order.

**(b)  Alleged Violations of the Automatic Stay**

By the remaining counts of the Amended Complaint, Quintao seeks damages under § 362(k)(1) of the Bankruptcy Code for alleged violations of the automatic stay.  Subsection (k)(1) states that subject to an exception not relevant here, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).  It requires proof that the entity against whom damages are sought (i) violated a stay provided by § 362 (ii) willfully and (iii) thereby injured the individual debtor.  *In re Slabicki*, 466 B.R. 572, 577–78 (B.A.P. 1st Cir. 2012).  In the Amended Complaint, Quintao seeks damages for two violations, those identified above as the bases for Counts I

---

[6] The Confirmation Order was prepared as a proposed order by the chapter 13 trustee and, before entry by the Court in the form proposed, circulated to Quintao, his attorney, and the Mortgagee and held for nineteen days without objection.

and II; and in response to the present motion, he now contends that the evidence also supports a

finding of a third violation, that AHMSI's notation of the prepetition arrearages in its internal records

was a violation of the stay.  The Amended Complaint is sufficiently ambiguous, especially in combination

with arguments advanced in conjunction with this motion, that it is necessary to address a fourth

possibly-alleged violation, that the Mortgagee's payment of the prepetition arrearage was itself a

violation of the automatic stay. I will address the four alleged violations in chronological order.

**(1)  Notation of Arrearage on Internal Records**

Quintao now argues that the Defendants first violated the automatic stay, specifically the stay in

subsection (a)(3) of any act to exercise control over property of the estate, when AHMSI, as agent for

the Mortgagee, recorded in its internal files the fact that Quintao was in arrears on his property tax and

water and sewer obligations to the Town.  Quintao argues that the notation of this arrearage

constituted the initiation of foreclosure proceedings and occurred before the Mortgagee had obtained

relief from the automatic stay to foreclose.

The gravamen of this count was AHMSI's alleged recording of a notation in its internal records,

on July 28, 2010, that the Property was an imminent loss due to the prepetition taxes owed to the Town.

Quintao does not contend that the action on which this count was founded included anything more than

the making of this notation.

The making of this notation was not a violation of the automatic stay against acts against

property of the estate.  The automatic stay is in fact a collection of stays set forth in § 362(a)(3).  In this

unpled count, Quintao contends that the act in question violated the stay in subsection (a)(3) against

"any act . . . to exercise control over property of the estate."  11 U.S.C. § 362(a)(3). A mortgagee's

recording of a notation to the effect that a debtor is in arrears on obligations that constitute a lien on

the debtor's property with priority over the creditor's own mortgage is not an act to exercise control

over property of the estate, even if, on the basis of the information recorded, the mortgagee decided to

seek, and obtained, relief from the stay to foreclose on property of the estate, and then did take steps

to foreclose, including by paying off a senior encumbrance in anticipation of foreclosure.  Surely a

mortgagee may keep internal records of senior encumbrances, and of the debtor's payment history,

without thereby violating the stay, even if these records prompt the mortgagee to later action.  The

keeping of internal records did not in itself effect an exercise of control over the Property.[7]  The

Defendants are accordingly entitled to judgment on this count as a matter of law.  I need not address

the further difficulty posed by the fact that, by this count, Quintao is relying on facts that he has not

pled as a basis for relief.

### (2) Payment of Arrearage

In certain of the arguments he has interposed against summary judgment, Quintao seems to

argue that, by his Amended Complaint, he seeks a determination that AHMSI, as agent for the

Mortgagee,  violated the stay when it sent the October 2010 AHMSI Check in the amount of $17,891.53

to the Town to pay off the Overdue Taxes.  At oral argument, however, Quintao's attorney clarified that

Quintao does not seek a determination that the sending of this payment was a violation of the stay.  I

accept counsel's clarification.  For good measure, however, I add that the sending of this check was not

a violation of the stay because, when it happened, the Mortgagee had received, and continued to enjoy,

relief from the stay to exercise its rights as to the Property, which rights undisputedly included the right

to make this payment.

### (3) Sending of Account Statement after Reimposition of the Stay

The factual basis for the stay violation alleged in Count I is that the Defendants sent a series of

documents to him—an escrow analysis, a notice of default, and an account statement—that showed an

increase in his required monthly payments and that Quintao viewed as demands for payment.  In the

---

[7] And in any event, before the Mortgagee took any action to exercise control over the Property, it sought and
obtained relief from the stay to do so.

14

Amended Complaint, Quintao's relevant allegations are that: (a) in February 2011 he received from

AHMSI an escrow analysis that for the first time included the real estate taxes and quantified his escrow

shortfall as $23,553.45, on account of which it further stated that the escrow component of his monthly

payments was increasing by $1,962.79, to $2,347.91 per month; (b) in September 2011, AHMSI sent

Quintao correspondence stating that he was in breach of the terms of his mortgage for not making

complete payments; and (c) in an account statement of September 16, 2011 (the Amended Complaint

does not indicate who sent this document), his escrow balance showed a negative balance of

$16,855.08.

For two reasons, these communications are insufficient as a matter of law to amount to stay

violations.  The first, which applies to all three communications, is that the communications occurred

while the Defendants enjoyed the benefit of the Court's grant of relief from the stay.  By virtue of that

order, the Mortgagee was granted relief from the stay to exercise its rights as to the Property, and this

grant of relief was in effect from September 24, 2010 until July 24, 2012.  The communications and

actions in February, April, and September 2011 occurred while the Court's grant of relief from the stay

continued in effect, and all were within the scope of the relief granted.  It follows that these actions

cannot be stay violations.

The second reason, which applies to the February 2011 Escrow Analysis and the September 16,

2011 Account Statement, is that by operation of local rule MLBR 4001-3(a) of the Bankruptcy Court for

this district, relief from the automatic stay is granted automatically—without need of a motion or

order—for a mortgagee or its agent to send the debtor a written notice, analysis, accounting, or account

statement,[8] provided such correspondence does not make demand for payment or threaten foreclosure

---

[8] That local rule provides as follows:

> To the extent that the automatic stay under 11 U.S.C. § 362(a) may be
> applicable to a debtor or property of the estate and has not terminated or
> been lifted, relief from the automatic stay shall be deemed granted, without

or dismissal of the case.  The copy of the September 16, 2011 Account Statement that Quintao adduced

in response to the motion for summary judgment does not include a demand for payment and does not

threaten foreclosure or dismissal.  Quintao has adduced no copy of the February 2011 Escrow Analysis,

but neither does he contend, nor has he adduced evidence, that it included a demand for payment or

threatened foreclosure or dismissal.

It is not clear whether this count is also based on the Defendants' sending of account

statements other than the statement of September 16, 2011.  Quintao adduced a number of these in his

evidentiary response to the motion for summary judgment.  See Plaintiff's Statement of Facts, doc. #55,

at .pdf file pp. 75-84 (Exhibit L: 2011 AHMSI Monthly Statements), 127-37 (Exhibit R: Homeward

Residential Statements), and 168-80 (Exhibit W: Ocwen Mortgage Statements).  Many were sent during

the period when the Defendants enjoyed relief from the stay and for that reason were not violations of

the stay.  All of them also fall within the protection of MLBR 4001-3(a) and for that reason too were not

violations of the stay.

For these reasons, I conclude, as to Count I and each of the various communications on which it

is based, that there are no genuine issues of material fact and that the Defendants are entitled to

judgment as a matter of law.

---

hearing or further order, in any case under any chapter of Title 11 of the
United States Code, in order to enable a secured creditor or its agent,
representative or nominee (excluding its attorney) to:
  (a) Send WRITTEN correspondence to the debtor, with a copy to
  debtor's counsel, consisting of statements, payment coupons, notices,
  analyses or accountings of any payment defaults, the status of
  insurance coverage, tax payments and/or municipal charges on
  property used as collateral and other such correspondence that the
  creditor typically sends to its non-debtor customers; EXCEPT that such
  correspondence shall not make demand for payment or threaten
  foreclosure or dismissal of the case.

### (4) Reports to Credit Reporting Agencies

In Count II, Quintao alleges that the Defendants violated the automatic stay by reporting to the credit reporting agencies that he had made late payments on his account from 2012 to 2014 and that the condition of his account in this period was "derogatory."  The Amended Complaint alleges that the making of these reports constituted an attempt to collect a prepetition debt.  In his Response to the Defendants' Statement of Undisputed Facts, Quintao states that on June 12, 2016, he was damaged by these reports because he was denied credit by a potential lender because his credit report falsely stated that his monthly mortgage payment obligation was $4,706, when in fact, shorn of the considerable escrow component of that sum, his actual mortgage payment was in fact $1,816.09.  In response to the motion for summary judgment, Quintao now advances as the gravamen of this count not that the Defendants pressured him into paying prepetition debt by making a report to the credit reporting agencies, but that they pressured or coerced him into paying prepetition debt by making *false* reports to these agencies, reports that were false in that they overstated his monthly mortgage payment.

Section 362(a)(6) stays "any act to collect, assess, or recover a claim against the debtor that arose before" the filing of the petition.  11 U.S.C. § 362(a)(6).  This provision generally prohibits creditors from making demand on a debtor to pay a prepetition debt or engaging in communications with the debtor in an effort to collect the debt.  While the automatic stay is broad, it is not unlimited. Providing information regarding a debtor to a credit reporting agency while the debtor is still in a chapter 13 case is not, in and of itself, a violation of the stay.  *In re Porcoro*, 565 B.R. 314, 325 (Bankr. D. N.J. 2017) (and cases cited) (the mere reporting of credit information about a debtor is not an act to collect a debt).  Manufacturing a false report to a credit agency in order to coerce a payment from a debtor would be a different story.  But even the errant reporting of a debt to a credit reporting agency would not be a stay violation absent evidence that it was done to coerce a payment.

17

This count falters because, in response to the motion for summary judgment, Quintao, who bears the burden of proving a violation of the stay and specifically (given the theory on which he relies) that the reported mortgage payment was false, has submitted no evidence from which a reasonable finder of fact could find that the allegedly reported amount was false.  The entire issue boils down to whether the Mortgagee was entitled to recover, through escrow payments over twelve months, the monies it advanced to pay Quintao's prepetition arrearage to the Town.  If it was, then the reported amount was correct; if not, then it was grossly overstated.

Quintao does not dispute that under the Mortgage itself, he was obligated to reimburse the Mortgagee over twelve months for any advance it made on senior lien obligations, which would include the amounts paid by the Mortgagee to the Town.  Quintao says this normal obligation was altered by some combination of the confirmed Plan and the automatic stay, but on this he is wrong.  The Plan did not purport to modify the rights of the Mortgagee; to the contrary, by the Plan, Quintao committed himself to remaining current on his payment obligations under the Mortgage, whatever they may be. Once the Mortgagee made the arrearage payment to the Town, Quintao became obligated to reimburse the Mortgagee for these amounts through the escrow component of his monthly payments over twelve months.  The automatic stay did not prevent this obligation from arising; it only prevented the Mortgagee and its servicers from taking action to collect the obligation.  The fact remained that Quintao was obligated to reimburse the Mortgagee through monthly payments within twelve months. On the uncontroverted facts and as a matter of law, the allegedly reported mortgage payment was not false. Summary judgment shall accordingly enter as to Count II.

18

V.      **Conclusion**

For the reasons set forth above, I conclude that there are no issues of genuine fact and the

Defendants are entitled to judgment on all counts as a matter of law.  A separate judgment shall enter

accordingly.


Date:  July 16, 2018                                   _____
                                                       Frank J. Bailey
                                                       United States Bankruptcy Judge

19